**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Brigette D. Smith,

                                                      Case No.: 1:10-cv-582

        Plaintiff,

     v.

                                            Judge Michael R. Barrett

Interim HealthCare of Cincinnati, Inc.,

        Defendant.

## OPINION & ORDER

This matter is before the Court on two motions filed by Defendant Interim HealthCare of Cincinnati, Inc.: (1) Defendant's Motion to Strike or Disregard (Doc. 21)[1]; and (2) Defendant's Motion for Summary Judgment (Doc. 14). Relative to both motions, Plaintiff Brigette D. Smith has filed responses in opposition (Docs. 22, 17), and Defendant has filed replies in support (Docs. 23, 20). In support of her response to Defendant's motion for summary judgment, Plaintiff has also filed Affidavits of Brigette D. Smith (Doc. 17-1), David Stanford (Doc. 17-2), Misty Morris (Doc. 18), and Tamera Russell (Doc. 19). These Affidavits are the subject of Defendant's motion to strike.

Plaintiff brings two claims: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e, et seq; and (2) race discrimination in violation of Section 2 of the Ohio Fair Employment Practices Act, O.R.C. §§ 4112.02(A) and 4112.99.[2] (Doc. 1 ¶¶ 15–20.)

---

[1] All Court document citations are to Docket Entry numbers.

[2] Plaintiff's third claim, which alleged fraud under Ohio law, was dismissed by this Court in response to Defendant's previously filed motion to dismiss. As a result, that Order also dismissed two prior Defendants: Peggy Applegate and Ron Durham. (Doc. 10, 20.)

## I.    Background

Because the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party when considering a motion for summary judgment, where facts are disputed, they represent Plaintiff's version of events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts do not include any information stricken by the Court. *See infra* Part II.A.

Plaintiff Brigette D. Smith was employed as a Home Care Coordinator by Defendant Interim HealthCare of Cincinnati, Inc. ("Interim") from September 17, 2007, to April 23, 2009. This was essentially a sales position where Ms. Smith solicited physicians, hospital administrators, social workers, and nursing-home administrators to contract with Interim to provide home nursing care to patients who were discharged but still needed health-care services. She was also to act as a liaison between Interim, patients, and their health-care providers. Ms. Smith was the only African-American employed in such a sales position. (Doc. 17, 3; Doc. 1 ¶ 7.) She was hired by Cheryl Hastings, Defendant's Regional Vice-President in the Cincinnati area, and she reported directly to Peggy Applegate, the Branch Manager of Defendant's Hamilton office where Ms. Smith was based. (Doc. 1 ¶ 3; Doc. 17, 1; Doc. 14-1 ¶ 2.) Ms. Applegate allegedly ran the Hamilton office in a slovenly and unprofessional manner, and recordkeeping was incomplete or non-existent. (Doc. 19 ¶ 4.) Plaintiff also worked with Jo Rinck, Interim's Intake Coordinator at the Hamilton office. (Doc. 1 ¶ 9.)

Plaintiff alleges that Ms. Applegate "harbored an animus against African-Americans in general, and Smith in particular." (Doc. 17, 2.) While Ms. Applegate was generally friendly in her dealings with Ms. Smith, she allegedly made certain derogatory

comments about African-Americans.  In particular, she made a comment about Barack Obama during the 2008 Presidential election campaign, and on one occasion, she showed Ms. Smith a cartoon making fun of President Obama because of his race. (Doc. 17, 3–4; Doc. 17-1 ¶ 6.)  Furthermore, Ms. Applegate allegedly made disparaging remarks about African-Americans out of Ms. Smith's presence.  David Stanford, the Caucasian male hired as Ms. Smith's successor in the Home Care Coordinator position, stated that Ms. Applegate and Ms. Rinck made disparaging about Ms. Smith's race, and in particular about the abilities of African-American females.  (Doc. 17-2 ¶ 3.)  Misty Morris, Ms. Applegate's Administrative Assistant and the Office Manager of Interim's Hamilton Office, also stated that Ms. Applegate often made disparaging comments about Ms. Smith because of her race.  She specifically states that Ms. Applegate called Ms. Smith a "fucking black bitch" on numerous occasions.  (Doc. 18 ¶¶ 2, 3.)

Ms. Smith maintains that Interim's negative reputation, and particularly the negative reputation of Ms. Applegate and Ms. Rinck, were the greatest impediments to obtaining sales referrals.  Ms. Smith states that despite these hurdles, she worked hard at her job and after several months, she began to increase her monthly sales numbers. (Doc. 17, 4.)  Ms. Smith alleges that she received only positive feedback from Ms. Applegate and Ms. Hastings during her time of employment.  Although she never received a performance review and she never had any hard quotas or sales goals, she did earn quarterly bonuses based on her sales.  (Doc. 1 ¶ 8; Doc. 17, 4.)  Ms. Smith further testified that she had no indication that her performance was lacking.  (Doc. 17, 4; Doc. 13-1, 62.)

However, at some point during her employment Ms. Smith's sales numbers

began to fall.  In early 2008, she discovered that she was not being credited for some of her referrals.  (Doc. 17, 4–5.)  Ms. Smith discovered that Ms. Rinck, the Intake Coordinator responsible for processing all incoming referrals, was directing incoming business away from Ms. Smith by not assigning referrals to her.  (Doc. 17, 5; Doc. 1 ¶ 9.)  Ms. Rinck allegedly refused to assign certain classes of referrals to Ms. Smith despite that she properly should have done so.  (Doc. 17, 5.)  Ms. Smith alleges that Ms. Applegate may have directed Ms. Rinck to steer incoming business away from Ms. Smith so that she did not receive commissions on business generated from her sales calls.  (Doc. 1 ¶ 9; Doc. 13-1, 50, 51–52.)

Ms. Smith complained to Ms. Applegate about Ms. Rinck's actions, specifically mentioning that Ms. Rinck may be motivated by racial animus.  (Doc. 1 ¶ 9; Doc. 17, 5.)  Ms. Applegate responded indifferently, but she did promise to investigate.  (Doc. 17, 5.)  Ms. Smith also contacted Ms. Hastings about the situation, but she did not raise the issue of discriminatory motivation with her.  Ms. Hastings stated that she would address the issue, and she did apparently speak with Ms. Rinck, but Ms. Smith's problems with Ms. Rinck continued.  (Doc. 17, 5.)

In January 2009, Ms. Applegate contacted Ms. Hastings and asserted that Ms. Smith was not producing enough referrals.  Ms. Hastings sent Susan Buller, Interim's Vice-President of Sales, to meet with Ms. Applegate and Ms. Smith.  At a January 22, 2009, meeting, Ms. Buller discussed certain sales techniques, but Plaintiff maintains that there was no discussion of quotas for Medicare referrals.  (Doc. 17, 6.)  Defendant maintains that Ms. Buller informed Ms. Smith that Medicare referrals were an important part of Defendant's business and that sales staff were expected to obtain 20 Medicare

referrals each month.  (Doc. 14, 3.)

On February 26, 2009, Ms. Buller, Ms. Applegate, and Ms. Smith held a follow-up meeting where Ms. Smith learned for the first time that she would be expected to meet a quota of 20 Medicare referrals per month.  Ms. Smith alleges that this was the first she had ever heard of any quota or formal sales goals.  Upon confronting Ms. Buller with this fact, Ms. Smith alleges that Ms. Buller asserted that this quota had always been in effect.  (Doc. 17, 6.)  Ms. Smith states that emails sent after her termination, which occurred on April 23, 2009, confirmed that she was indeed responsible for 20 Medicare referrals per month prior to this meeting.  (Doc. 17, 6; Doc. 1 ¶ 11.)  However, she further alleges that such a quota was an impossible goal to reach because those in her job would not know in advance what portion of a client's patients received Medicare.  As she put it, achieving such a goal "was more a shot in the dark or luck of the draw," given that there was no way for her to shift her focus to Medicare patients.  (Doc. 17, 6.)  Ms. Smith further alleges that none of the other salespeople in the region, all of whom were Caucasian, was given such a quota.  (Doc. 17, 6–7.)  These salespeople were Tori Mahaliyo, at the Hamilton office, and Jennifer Nabli and Sarah Bulla at the Kenwood office.

On March 27, 2009, Ms. Applegate placed Ms. Smith on 30-days probation for failure to meet the 20-Medicare-referrals-per-month quota.  (Doc. 1 ¶ 10; Doc. 17, 7.)  However, Ms. Smith alleges that sales were down at all Interim offices throughout the region because of the economic downturn.  She states that Ms. Bulla and Ms. Nabli were also placed on probation for failing to meet sales goals, but both of them were given more than 30 days to improve.  Ms. Bulla quit before the expiration of that period,

but Ms. Nabli was given a second 30-day probation period despite that her sales numbers remained low.  Ms. Nabli was terminated at the end of that second, 30-day probationary period.  (Doc. 17, 7.)

Ms. Applegate terminated Ms. Smith on April 23, 2009, for failing to meet her Medicare sales quota.  (Doc. 17, 7; Doc. 1 ¶ 11.)  Defendant maintains that Ms. Smith obtained only two Medicare referrals during her probationary period and only nine for all of 2009.  (Doc. 14, 3.)  Apparently, Plaintiff was terminated a handful of days short of the full 30 days because, "it was obvious to the company that Ms. Smith's performance was not improving."  (*See* Doc. 14-1 ¶ 7.)

A Caucasian male, David Stanford, replaced Ms. Smith.  (Doc. 17, 7.)  He alleges that he had an experience similar to Ms Smith's.  He states that he never received a formal review, but always received positive feedback from Ms. Applegate.  (Doc. 17-2 ¶ 4.)  However, after being in the job for nearly a year, he began to notice that he was not receiving credit for all the referrals he brought into the office.  He confronted Ms. Rinck about this, but she allegedly told him that she would not credit him for any referral that Mr. Stanford did not call in or physically bring to the office.  Mr. Stanford maintains that this new policy was patently unfair and inconsistent with other policies, and that it resulted in his sales figures dropping despite his best efforts and through no fault of his own.  (Doc. 17-2 ¶¶ 5, 6.)  As a result, his sales figures fell, he was placed on probation, and his employment was terminated for having low sales.  (Doc. 17-2 ¶ 6.)  He contends, in effect, that Ms. Rinck applied an incorrect policy to his referrals "in order to sabotage my sales figures, and thereby engineer my termination."  (Doc. 17-2 ¶ 7.)

Ms. Smith alleges that her employment was terminated because of Defendants' racial discrimination.  She has two claims pending: (1) race discrimination in violation of Title VII, and (2) race discrimination in violation of the Ohio Fair Employment Practices Act.  (Doc. 1 ¶¶ 15–20.)  She seeks compensatory damages, punitive damages, and an award of attorney's fees.  (Doc. 1, 5.)

## II.     Legal Analysis

Two motions are presently before the Court: Defendant's Motion to Strike or Disregard, and (2) Defendant's Motion for Summary Judgment.  Because any decision on the motion to strike could affect the evidence relevant to the motion for summary judgment, the Court considers the motion to strike first.  *See Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.")

### A.     Motion to Strike

Defendant's motion to strike requests that this Court strike or disregard the Affidavit of Misty Morris (Doc. 18) in its entirety, and portions of the Affidavits of Plaintiff Brigette D. Smith (Doc. 17-1), David Stanford (Doc. 17-2), and Tamera Russell (Doc. 19).  (Doc. 21, 1.)  Defendant argues that because Plaintiff did not cite to or reference Ms. Morris's Affidavit, and because portions of Ms. Smith's, Mr. Stanford's, and Ms. Russell's Affidavits are inadmissible, this Court must not rely on them and they should be stricken.  (Doc. 21, 2, 3.)

#### 1.     Legal Standard

Newly revised Rule 56 of the Federal Rules of Civil Procedure governs the

procedure by which courts must review objections to the admissibility of evidence presented in connection with a motion for summary judgment. *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 U.S. Dist. LEXIS 125373, 2011 WL 5169384, at *1 (W.D. Mich. Oct. 31, 2011). The 2010 amendments to Rule 56 allow a party making or opposing summary judgment to cite materials in the record including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If a party believes that such materials "cannot be presented in a form that would be admissible in evidence," that party may file an objection. Fed. R. Civ. P. 56(c)(2). However, motions to strike are no longer appropriate under the 2010 amendments to Rule 56. *Foreword Magazine*, 2011 WL 5169384, at *2 (citing *Reed v. Austal, U.S.A., L.L.C.*, No. 08-00155-KD-N, 2011 U.S. Dist. LEXIS 108754, 2011 WL 4435562, at *5 n.6 (S.D. Ala. Sept. 23, 2011). Motions to strike should be construed as objections under Rule 56(c)(2). *Id.*; see also *Foust v. Metro. Sec. Servs., Inc.*, No. 3:10-cv-340, 2011 U.S. Dist. LEXIS 118138, 2011 WL 4832570, at *4 (E.D. Tenn. Oct. 12, 2011) (treating motion to strike as an objection made under Rule 56(c)(2)) "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 (2010 Advisory Committee comments); *see also Foreword Magazine*, 2011 WL 5169384, at *2.

Regarding affidavits, Rule 56(c) requires that "[a]n affidavit . . . must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[T]he Court must only strike the inadmissible portions of an affidavit, rather than the whole affidavit." *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1057 (E.D. Mich. 2011). "It is Defendants' obligation to specifically identify which statements in the affidavits should be struck." *Id.* at 1058 (citing *AT&T v. Shared Comm'ns Servs.*, No. 93-3492, 1995 WL 555868, at *3 1995 U.S. Dist. LEXIS 13706, at *9 (E.D. Pa. Sept. 13, 1995)). It is improper for a court to consider hearsay evidence on a motion for summary judgment. *Id.* at 1057 (citing *Wiley v. United States*, 20 F.3d 222, 225–26 (6th Cir. 1994) ("hearsay evidence cannot be considered on a motion for summary judgment")).

### 2. Affidavit of Misty Morris

Defendant first argues that because "Plaintiff does not refer to the affidavit of [Misty] Morris in her Opposition . . . . this Court must not rely on this Affidavit and it should be stricken." (Doc. 21, 3.) As Defendant recognizes, "it is not the district court's duty 'to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Wimbush v. Wyeth*, 619 F.3d 632, 639 n.4 (6th Cir. 2010) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989)). However, the newly revised Rule 56(c) states that "[t]he court need consider only the cited materials, *but it may consider other materials in the record.*" Fed. R. Civ. P. 56(c)(3) (emphasis added). Accordingly, the Court is not required to strike the affidavit of Misty Morris simply because Plaintiff does not refer to it specifically; a court may consider uncited material in the record if it chooses. Fed. R. Civ. P. 56(c)(3). Defendant's objection is OVERRULED to this extent. The Affidavit of Misty Morris (Doc. 18) is not stricken.

### 3.    Affidavit of Brigette D. Smith

Defendant next maintains that the affidavit of Plaintiff Brigette Smith (Doc. 17-1)

contains inadmissible hearsay.  (Doc. 21, 4.)  Hearsay evidence cannot be considered

on a motion for summary judgment.  *Wilson*, 762 F. Supp. 2d. at 1057.  Rule 801(c) of

the Federal Rules of Evidence defines hearsay as "a statement, other than one made

by the declarant while testifying at the trial or hearing, offered in evidence to prove the

truth of the matter asserted."  Fed. R. Evid. 801(c).

Defendant points to paragraphs 7 and 13 of Ms. Smith's affidavit.  Paragraph 7

states as follows:

> In fact, I later learned from a coworker, Tina Knight, that
> Ms. Applegate often made disparaging comments about me
> behind my back.  Also, I received a telephone call from
> David Stanford, who replaced me as Home Care
> Coordinator (and who was a Caucasian male), that she had
> made similar comments to him.

(Doc. 17-1 ¶ 7.)  Paragraph 13 of Ms. Smith's affidavit states, "I later learned from two

coworkers, Tori Mahaliyo and Misty Morris, that Applegate had instructed Rinck to direct

incoming business away from me."  (Doc. 17-1 ¶ 13.)  Defendant argues that these

alleged statements by Tina Knight, David Stanford, Tori Mahaliyo, and Misty Morris, as

reported by Ms. Smith, are inadmissible hearsay not subject to any exception.  (Doc. 21,

4.)  Here, Plaintiff bears the burden of showing that "the material is admissible as

presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56

(2010 Advisory Committee comments); *see also Foreword Magazine*, 2011 WL

5169384, at *2.

Plaintiff argues that the challenged testimony echoes testimony given by Ms.

Smith in her deposition and that the affidavits are synopses of the more detailed

questioning contained in her deposition.  Because Defendant did not object to that

testimony at the time of the deposition or in Defendant's motion to dismiss, Plaintiff

argues that Defendant is now estopped from objecting to those same statements in Ms.

Smith's affidavit.  (Doc. 22, 2–3.)  Plaintiff offers no cite to rule or caselaw to support this

contention.  (*See* Doc. 22.)  And as Defendant points out (Doc. 23, 2), Plaintiff does not

offer an exception to the hearsay rule or contest that the challenged passages qualify as

hearsay in the first place (*see* Doc. 22).

Plaintiff's estoppel argument is unavailing.  Because hearsay cannot be

considered on a motion for summary judgment, *Wilson*, 762 F. Supp. 2d. at 1057, and

because Plaintiff does not contest the assertion that the challenged passages qualify as

hearsay without an exception or carry her burden of showing how the statements are

admissible, Fed. R. Civ. P. 56 (2010 Advisory Committee comments), Defendant's

objection here is SUSTAINED.  The Court will not consider paragraphs 7 and 13 of the

Affidavit of Brigette D. Smith (Doc. 17-1).  However, this ruling does not preclude

Plaintiff from attempting to present similar evidence at trial.  The holding here only

applies to Defendant's motion for summary judgment.

### 4.    Affidavit of David Stanford

Defendant next argues that the Affidavit of David Stanford (Doc. 17-2) contains

statements that are not relevant to Plaintiff's discrimination claims.  (Doc. 21, 5.)  Rule

402 of the Federal Rules of Evidence states, "Evidence which is not relevant is not

admissible."  Fed. R. Evid. 402.  Defendant specifically objects to paragraph 7 of

Stanford's affidavit, which states as follows:

> When I subsequently applied for unemployment benefits,
> Ms. Hastings testified at the unemployment hearing that the

company's policy was to credit a salesperson with referrals from clients on whom that client had made sales calls, regardless of how they arrived at the office. Either Ms. Hastings lied during that hearing, or else Ms. Applegate and Ms. Rinck had changed the policy themselves in order to sabotage my sales figures, and thereby engineer my termination.

(Doc. 17-2 ¶ 7.) Plaintiff maintains that this statement shows that even though Cheryl Hastings testified at an unemployment hearing that the company had one policy about crediting a salesperson with referrals from clients, a different policy was applied by either Ms. Applegate or Ms. Rinck to divert business away from Plaintiff and Mr. Stanford. Plaintiff argues that this evidence is relevant because it establishes a pattern of conduct: "when Applegate wished to terminate a salesperson she disliked, she would intervene to divert sales away from them—in contradiction of the policy relayed by Hastings—then assert their allegedly poor sales performance as grounds for disciplinary action." (Doc. 22, 4.) In other words, Plaintiff argues that this statement is directly relevant to her racial discrimination claims because "it corroborates the mechanism used by Applegate to manufacture Smith's termination." (Doc. 22, 4.)

The Court agrees with Plaintiff here. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. If Ms. Applegate had a mechanism she used to terminate salespeople she disliked, as Plaintiff alleges, then evidence of such a mechanism is a consequential fact to the determination of this action because Ms. Applegate may have used that mechanism to terminate Plaintiff. The challenged paragraph is relevant.

However, Defendant further argues that "the assertion that Cheryl Hastings lied is nothing more than Stanford's unsupported conclusion." (Doc. 21, 5.) Plaintiff does not respond to this point (*see* Doc. 22), but the Court does not believe that Ms. Stanford's conclusion is unsupported. His logic is clear. He states that Ms. Hastings testified that one policy applied to him and Plaintiff, but that a different standard was applied in actuality. He then proposes a conclusion to account for that incongruity. That conclusion may or may not be correct, and a jury may or may not choose to believe it, but regardless, it is supported by what he observed.

For the foregoing reasons, Defendant's objection to paragraph 7 of the Affidavit of David Stanford (Doc. 17-2) is OVERRULED. The Court may consider that statement in ruling on Defendant's motion to dismiss.

### 5. Affidavit of Tamera Russell

Defendant next argues that portions of the Affidavit of Tamera Russell (Doc. 19) are not relevant and are prejudicial. (Doc. 21, 5.) Defendant refers to paragraphs 5 through 14. They read as follows:

> 5. Ms. Applegate was very good at playing up to Ms. Hastings or other corporate personnel. On those days, Ms. Applegate would wear a business suit and adopt a friendly attitude. She would even talk differently. My colleagues and I would joke that when Ms. Applegate would greet us in the morning, we knew Ms. Hastings would be visiting later that day.

> 6. Prior to my hire, the Hamilton office had received a negative referral from the Ohio Council on Aging the previous two years. Ms. Applegate was adamant that office receive a positive rating on the next audit.

> 7. To that end, I began to audit the home health aid charts. These charts recorded the services provided to each patient, and the services for which the company billed the medical insurance provider. Following the standard practice,

the patient was to sign the chart after services were provided. I discovered that for some of the services the company billed there were no patient signatures, indicating that these services had not actually been performed. In particular, there were no home visits by the homestyle supervisor to ensure that the patient was receiving proper care.

8. When I brought this to Ms. Applegate's attention, she, through her assistant, Jo Rinck, instructed me to visit these patients and "persuade" them that the services were actually performed, but that the care provider had inadvertently failed to obtain their signature. I was also to sign off on these changes as the department supervisor. Two new hirees, Amy Campbell and Jeffery Wilburn (who was also my brother) were assigned to my department to complete this task.

9. When I met with Ms. Campbell and Mr. Wilburn, I explained Ms. Applegate's instructions, but also my reservations with that assignment. We agreed that we would not alter charts for services provided prior to our hire, but instead mark these "before my employment."

10. We also met with Ms. Applegate to express our concerns. Ms. Applegate denied any wrongdoing and blamed me for everything, even though the order to alter the patient charts had originated with her. At this point, Ms. Campbell quit in disgust.

11. Within a week, Ms. Applegate called me into her office and confronted me with several charts on which she claimed Mr. Wilburn had forged patient signatures. Although the handwriting on each document was the same, it was obviously female and not my brother's—I knew my brother's handwriting well. When I pointed out this fact, Ms. Applegate claimed that Mr. Wilburn must have had a "female friend" sign these documents for him. This seemed to me to be nothing more than wild speculation.

12. When I stood firm and reiterated that my brother would not knowingly forge a patient's signature, Ms. Applegate accused me of "covering up" for my brother. I nonetheless continued to back Mr. Wilburn, so Ms. Applegate terminated me.

13. The company then reported that Mr. Wilburn had forged patient signatures to the Ohio Board of Hearing. That claim was so attenuated, however, that, after an initial investigation, the board dismissed the charges without ever[]

filing a complaint.

> 14. Mr. Wilburn and I were terminated because we resisted Ms. Applegate's illegal attempt to "clean up" the home health aid charts by forging patient signatures. Mr. Wilburn was also set up to provide a scapegoat should any of Ms. Applegate's forgeries subsequently be uncovered.

(Doc. 19 ¶¶ 5–14.) Defendant argues that Ms. Russell's "statements and the facts related to her termination are simply not relevant to Plaintiff's claims." (Doc. 21, 6.) Plaintiff maintains that this is relevant because it shows that "[w]ith both Smith and Russell, Applegate was willing to lie and cheat in order to achieve her goals," and it is relevant to Plaintiff's racial discrimination claim because, "it reveals the lengths to which Applegate would go to achieve her end." (Doc. 22, 4–5.)

This raises the second reason why Defendant objects to this portion of Ms. Russell's affidavit: Defendant maintains that even if these statements are relevant, "the statements are still inadmissible as their probative value is substantially outweighed by the danger of unfair prejudice." (Doc. 21, 6.) Rule 403 of the Federal Rules of Evidence states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. Plaintiff's response states that "[t]his evidence does paint Applegate ruthless and manipulative—a 'bad actor'—because that's the way she ran the Hamilton Office." (Doc. 22, 5.)

The Court agrees with Defendant on both grounds for objection here. Ms. Applegate may be a "bad actor," but that has no relevance to whether a genuine dispute of material fact exists on Plaintiff's racial discrimination claims. Furthermore, even if it were relevant, this attempt to paint Ms. Applegate as ruthless and manipulative presents too high a danger of unfair prejudice to warrant consideration of these

statements on Defendant's motion for summary judgment.

For these reasons, Defendant's objection here is SUSTAINED. The Court will not consider paragraphs 5 through 14 of the Affidavit of Tamera Russell (Doc. 19). But once again, the Court pauses to note that this ruling does not preclude Plaintiff from attempting to present such evidence at trial. The issue of what evidence may or may not be admissible at trial is not presently before the Court.

### 6.      Motion to Strike Conclusion

Based on the foregoing, Defendant's Motion to Strike or Disregard (Doc. 21), which is construed as an objection to Plaintiff's evidence under Rule 56(c)(2) of the Rules of Civil Procedure, is OVERRULED in part and SUSTAINED in part. The Court's rulings are summarized below.

### B.      Motion for Summary Judgment

Defendant also moves for summary judgment. Defendant argues that there are no genuine disputes of material fact in this case and that it is entitled to judgment as a matter of law. (Doc. 14, 1.)

### 1.      Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his or her pleadings, but must present significant probative evidence in support of his or her complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## 2. Race Discrimination

Plaintiff alleges race discrimination under federal law in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e, et seq, and under Ohio law in violation of Section 2 of the Ohio Fair Employment Practices Act, O.R.C. §§ 4112.02(A) and 4112.99. (Doc. 1 ¶¶ 15–20.) Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to . . . employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1). Ohio law similarly makes race discrimination unlawful. O.R.C. § 4112.02. The Ohio Supreme Court has held that federal case law interpreting Title VII is equally applicable

to cases of discrimination under Ohio law.  *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)).  Therefore, the following analysis applies to both claims.  *See id.*

In a Title VII action and under Ohio law, a plaintiff must produce either direct evidence or circumstantial evidence of discrimination.  *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)); *Holbrook v. LexisNexis*, 862 N.E.2d 892, 896 (Ohio Ct. App. 2006).  Here, Plaintiff does not assert the existence of direct evidence of discrimination.  (Doc. 17, 9.)  Instead, the parties argue over indirect, circumstantial evidence of discrimination.  (Doc. 17, 9; Doc. 14, 5.)

### a.  Circumstantial Evidence of Discrimination—the *McDonnell Douglas* Framework

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), established a tripartite burden-shifting framework for evaluating discrimination claims in cases where plaintiffs rely on circumstantial evidence.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  Under the first step, "the plaintiff bears the initial 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence."  *Id.* (quoting *Burdine*, 450 U.S. at 253).  Second, if a plaintiff can establish a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S. at 802).  Third, if the

defendant articulates such a reason, the burden shifts back to the plaintiff to present evidence that the non-discriminatory reason offered by the defendant was merely a pretext for discrimination. *Id.*; *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). "Although the burdens of production shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Burdine*, 450 U.S. at 253). Ohio courts have embraced the *McDonnell-Douglas* framework to resolve race-discrimination claims brought under Ohio law, thus, the same analysis applies to both of Plaintiff's claims. *See, e.g.*, *Grooms v. Supporting Council of Preventative Effort*, 809 N.E.2d 42, 49 n.3 (Ohio Ct. App. 2004).

### i. *McDonnell Douglas* Step One—Prima Facie Case

The burden of establishing a prima facie case of discrimination is "not onerous." *Burdine*, 450 U.S. at 253. "[A]t the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Macy*, 484 F.3d at 364 (quoting *Burdine*, 450 U.S. at 253). The establishment of a prima facie case creates a rebuttable presumption of unlawful discrimination. *Burdine*, 450 U.S. at 253, n.7.

To establish a prima facie case of race discrimination, "the plaintiff must show that '(1) he or she was a member of a protected class; (2) he or she suffered an adverse

employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo*, 358 F.3d at 415). Defendant initially argued that Plaintiff cannot establish a prima facie case of discrimination (Doc. 14, 5), but in its reply in support, Defendant concedes that Plaintiff states a prima facie case of discrimination by demonstrating that she was replaced by an employee outside the protected class. (Doc. 20, 1.) As Defendant states, "Plaintiff was replaced with a Caucasian male, David Stanford . . . . This satisfies Plaintiff's prima facie case." (Doc. 20, 1.) Despite this admission, Defendant goes on to contest whether Plaintiff was treated differently than similarly situated employees. (Doc. 20, 3–4.) Given Defendant's admission that Plaintiff was replaced by a Caucasian male, there is no need to analyze whether similarly situated employees were treated more favorably than Plaintiff. The fact that someone outside the protected class replaced Plaintiff suffices to sustain a prima facie case. *Wright*, 455 F.3d at 707; *see also Person v. Progressive Servs. LLC*, 418 F. Supp. 2d 1006, 1012 (6th Cir. 2006). Plaintiff has raised sufficient genuine disputes of material fact to survive summary judgment on the issue of a prima facie case of race discrimination. *See id.*

> ii.     *McDonnell Douglas* **Step Two—Non-Discriminatory Reason for the Adverse Employment Action**

Now that Plaintiff has shown a prima facie case of race discrimination, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 570

(6th Cir. 2007) (citing *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)).  "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations and emphasis omitted) (quoting *Burdine*, 450 U.S. at 254).  "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment."  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (noting that the employer's burden is satisfied if it simply explains what it has done or produces evidence of legitimate nondiscriminatory reasons)).

Here, Defendant easily overcomes this hurdle.  Defendant maintains that it terminated Ms. Smith for failing to meet her sales quota.  (Doc. 14, 9.)  Failure to meet sales quotas can be a legitimate, nondiscriminatory reason for discharge.  *Succarde v. Fed. Express Corp.*, 106 F. App'x 335, 339 (6th Cir. 2004); *Gregory v. Interface Flooring Sys., Inc.* 66 F.3d 325, at *4 (6th Cir. 1995) (unpublished table decision).  Plaintiff does not oppose this finding (*see* Doc. 17, 11), and she admits that Defendant terminated her for failing to meet her sales quota (Doc. 17, 7; Doc. 1 ¶ 11).  Because this satisfies Defendant's burden of offering evidence of a legitimate, non-discriminatory reason for terminating Ms. Smith, the next step of the *McDonnell Douglas* analysis is reached. *See Bryson*, 498 F.3d at 570.

### iii.    *McDonnell Douglas* Step Three—Pretext for Discrimination

Now that Defendant has given a legitimate, non-discriminatory reason for Ms.

Smith's termination, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)). In other words, the question here is whether Ms. Smith has produced sufficient evidence to allow a jury to decide that, despite the plausibility of Defendant's nondiscriminatory reason for terminating her, the real reason she was terminated was that Defendant engaged in race discrimination. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation."). Direct evidence is not required here; only evidence "tending to show" that a defendant's proffered reason for discharge was false is necessary. *Skrjanc*, 272 F.3d at 316.

"A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: (1) by showing that the reason has no basis in fact; (2) by showing that the reason did not actually motivate the employer's action; or (3) by showing that the reason was insufficient to motivate the action." *Macy*, 484 F.3d at 366 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds)). "The plaintiff must produce 'sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against [her].'" *Upshaw*, 576 F.3d at 586 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

### 1)    The Grounds of Plaintiff's Pretext Argument

Although Plaintiff does not state it directly, she appears to argue that Defendant's stated reason did not actually motivate the termination.  (*See* Doc. 17, 11–15.) Specifically, Plaintiff argues, "the evidence establishes that the sales figures on which both Applegate and Hastings relied were inaccurate—that Smith had not been given credit for many of her referrals—and that at least Applegate, the person who actually terminated Smith, was aware of that inaccuracy." (Doc. 17, 11.)  To be sure that Plaintiff is truly arguing that Defendant's stated reason did not actually motivate the termination, the Court examines in more detail each of the three grounds that a plaintiff may use to demonstrate pretext.

The first ground on which a plaintiff may demonstrate pretext is by showing that the employer's stated reason for termination has no basis in fact.  *Macy*, 484 F.3d at 366.  This requires a plaintiff to "put forth evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (internal quotations omitted) (quoting *Manzer*, 29 F.3d at 1084).  This requires a showing of, "'more than a dispute over the facts upon which the discharge was based.'" *Id.* (quoting *Braithwaite v. Timkin Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).  The plaintiff must present evidence that the defendant did not have an honest belief in the reason given for the plaintiff's termination.  *Id.*  Because Ms. Smith admits that Defendant terminated her for failing to meet her sales quota (Doc. 17, 7; Doc. 1 ¶ 11), she cannot be arguing that Defendant's contention that it terminated Ms. Smith for failing to meet her sales quota is "factually false."  *See Abdulnour*, 502 F.3d at 502 (6th Cir. 2007).  Thus, this first ground for

showing pretext does not apply here.

The third ground on which a plaintiff may demonstrate pretext is by showing that the proffered reason was insufficient to motivate the action. *Macy*, 484 F.3d at 366. To show that an employer's reason for termination was insufficient to motivate discharge the plaintiff must present "'evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008) (quoting *Manzer*, 29 F.3d at 1084). In other words, the plaintiff must establish that she was treated less favorably than similarly situated, non-protected employees. *Id.* Plaintiff makes no mention of similarly situated employees in her arguments relating to pretext. (*See* Doc. 17, 11–15.) Accordingly, this ground does not fit Plaintiff's argument either.

As to the second ground for demonstrating pretext—that the proffered reason did not actually motivate the employer's action—"'the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 606 (6th Cir. 2008) (quoting *Manzer*, 29 F.3d at 1084). Upon attacking the proffered explanation, "the plaintiff attempts to indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivate was *more* likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. Stated differently, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

This ground for demonstrating pretext applies perfectly here. Ms. Smith admits that Defendant terminated her for failing to meet her sales quota. (Doc. 17, 7; Doc. 1 ¶ 11.) In other words, she "admits the factual basis underlying the employer's proffered explanation." *See Manzer*, 29 F.3d at 1084. However, in arguing that "the evidence establishes that the sales figures on which both Applegate and Hastings relied were inaccurate" (Doc. 17, 11), she attacks the credibility of Defendant's explanation with circumstantial evidence of discrimination. Accordingly, the Court is correct in assuming that Plaintiff is attempting to demonstrate that Defendant's proffered reason for terminating her is pretextual "by showing that the reason did not actually motivate the employer's action." *See Macy*, 484 F.3d at 366. With this established, the Court now has the correct framework within which to analyze the parties' arguments.

### 2)      Pretext—Did Not Actually Motivate

Defendant maintains that it terminated Ms. Smith for failing to meet her sales quota. (Doc. 14, 9.) Plaintiff argues that "the evidence establishes that the sales figures on which both Applegate and Hastings relied were inaccurate—that Smith had not been given credit for many of her referrals—and that at least Applegate, the person who actually terminated Smith, was aware of that inaccuracy." (Doc. 17, 11.) Here, it is Plaintiff's burden, *Bryson*, 498 F.3d at 570, to show by the sheer weight of circumstantial evidence that it is "more likely than not" that Defendant's explanation for firing her was a pretext for racial discrimination, *see Manzer*, 29 F.3d at 1084.

More specifically, Plaintiff alleges that "her sales figures were inaccurate and that many of the referrals she brought to Interim were either credited to other Interim personnel, or rejected outright." (Doc. 17, 11.) Ms. Smith first discovered that she was

not being credited for some of her referrals (her sales) in early 2008. (Doc. 17, 4–5.)

She alleges that Ms. Rinck, the Intake Coordinator responsible for processing all incoming referrals, was directing incoming business away from her by not assigning referrals to her. (Doc. 17, 5; Doc. 1 ¶ 9; Doc. 17-1 ¶ 10.) Ms. Smith maintains that Ms. Rinck would improperly assign some of her sales to closed-out accounts. She states that old accounts were closed after six months of inactivity. But if Ms. Smith sold services on that account, which occurred sometimes years after it was closed, Ms. Rinck credited the referral to the closed account rather than to Ms. Smith. (Doc. 17, 12; Doc. 17-1 ¶ 10.) Ms. Smith maintains that this is significant because much of her work "involved wooing back clientele who, for one reason or another, had stopped referring work to Interim . . . ." (Doc. 17, 12.) There were other categories of referrals that Ms. Rinck refused to accept, such as automobile accidents, wound care cases, and cases from certain providers. (Doc. 17, 12; Doc. 17-1 ¶ 11.) Ms. Smith complained about this situation to Ms. Applegate and Ms. Hastings, but there is no evidence to suggest that Defendant did anything to address the situation. (Doc. 17, 12; Doc. 17-1 ¶ 12.) Ms. Smith further alleges that Ms. Applegate may have directed Ms. Rinck to steer incoming referrals away from Ms. Smith. (Doc. 1 ¶ 9; Doc. 13-1, 50, 51–52.) Thus, Ms. Applegate must have been aware of the situation; she directed either Ms. Rinck to not credit Plaintiff with the proper number of referrals, or she never stopped Ms. Rinck from engaging in such improper behavior. Either way, when viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, *see Matsushita*, 475 U.S. at 587, a reasonable jury could conclude that Ms. Applegate knew that Plaintiff was not getting credit for all the sales she generated.

Moreover, Ms. Smith states that Ms. Applegate's motivation for such conduct can be reasonably inferred from her displays of racial animus. Discriminatory remarks can serve as evidence of pretext. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) ("We have held that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext."). When assessing the relevancy of such remarks, courts look first to the identity of the speaker. *Nair v. Columbus State Cmty. Coll.*, No. 2:02-cv-595, 2008 WL 48333, at *16 (S.D. Ohio Feb. 19, 2008). "Isolated discriminatory remarks made by individuals who 'played a meaningful role or may have influenced the adverse employment decision may be relevant when the plaintiff challenges the motive behind that decision.'" *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998)). Additionally, "where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." *Ercegovich*, 154 F.3d at 356.

Some of Ms. Applegate's statements serve as evidence of pretext here. Plaintiff alleges the following about Ms. Applegate: she "harbored an animus against African-Americans in general, and Smith in particular," (Doc. 17, 2); she made a racially discriminatory comment about Barack Obama during the 2008 Presidential election campaign (Doc. 17, 3–4; Doc. 17-1 ¶ 6); Mr. Stanford, the Caucasian male who replaced Ms. Smith, states that Ms. Applegate and Ms. Rinck made disparaging remarks about Ms. Smith's race, and in particular about the abilities of African-American females (Doc. 17-2 ¶ 3); and Misty Morris, Ms. Applegate's Administrative Assistant and

the Office Manager of Interim's Hamilton Office, states that Ms. Applegate called Ms. Smith a "fucking black bitch" on numerous occasions (Doc. 18 ¶¶ 2, 3). Viewing this evidence together, *see Ercegovich*, 154 F.3d at 356, a reasonable jury could conclude that Ms. Applegate was looking for an excuse to terminate Ms. Smith because of her race. She found such an excuse in Ms. Smith's sales numbers, which she knew would be artificially low because Ms. Smith's sales figures were incorrect.

Mr. Stanford's affidavit bolsters this conclusion. Like Ms. Smith, Mr. Stanford also affirms that he did not receive credit for all the referrals he was rightfully due. He brought this to Ms. Rinck's attention, but she allegedly told him that she would not credit him for any referral that he did not call in or physically bring to the office. Mr. Stanford maintains that this new policy was patently unfair and inconsistent with other policies. (Doc. 17-2 ¶ 5.) As a result, his sales figures fell, he was placed on probation, and his employment was terminated—the same as with Ms. Smith. (Doc. 17-2 ¶ 6.) He contends that Ms. Rinck applied an incorrect policy to his referrals "in order to sabotage my sales figures, and thereby engineer my termination." (Doc. 17-2 ¶ 7.) As discussed above, Plaintiff maintains that this evidence establishes a pattern of conduct: "when Applegate wished to terminate a salesperson she disliked, she would intervene to divert sales away from them . . . then assert their allegedly poor sales performance as grounds for disciplinary action." (Doc. 22, 4.) Stated more simply, David Stanford's affidavit "corroborates the mechanism used by Applegate to manufacture Smith's termination." (Doc. 22, 4.) Given Ms. Applegate's alleged discriminatory remarks and this evidence of a mechanism that she may have used to surreptitiously orchestrate an employee's termination, a reasonable jury could conclude that it is "more likely than not"

that Defendant's explanation for firing Ms. Smith was a pretext for racial discrimination. *See Manzer*, 29 F.3d at 1084. No further analysis here is necessary because this satisfies Plaintiff's burden of showing that Defendant's proffered reason for her termination was a pretext for unlawful discrimination. *See Bryson*, 498 F.3d at 570.

### b. *McDonnell Douglas* Framework Conclusion

Plaintiff has presented sufficient evidence at each step of the *McDonnell-Douglas* analysis to avoid summary judgment on her race discrimination claims under Title VII and Ohio law. Plaintiff has established a prima facie case of discrimination by a preponderance of the evidence, and she has carried her burden of presenting evidence that the non-discriminatory reason offered by Defendant for her termination was actually a pretext for racial discrimination. *See Burdine*, 450 U.S. at 253. Because Plaintiff has presented sufficient evidence to create a genuine dispute of material fact at each stage of the *McDonnell Douglas* inquiry, *see Cline*, 206 F.3d at 661, Defendant's motion for summary judgment is DENIED.

### III. Conclusion

Defendant's Motion to Strike or Disregard (Doc. 21), which the Court has construed as an objection to Plaintiff's summary-judgment evidence under Rule 56(c)(2) of the Rules of Civil Procedure, is **OVERRULED in part and SUSTAINED in part** to the following extent:

- Defendant's objection is **OVERRULED** as applied to the Affidavit of Misty Morris (Doc. 18). The Court is not required to strike that affidavit.

- Defendant's objection is **SUSTAINED** as applied to the Affidavit of Brigette D. Smith (Doc. 17-1.) Because hearsay cannot be considered on a motion for summary

judgment, the Court may not consider paragraphs 7 and 13 of that affidavit.

- Defendant's objection is **OVERRULED** as applied to the Affidavit of David Stanford (Doc. 17-2).  The Court is not required to strike any portion of that affidavit.

- Defendant's objection is **SUSTAINED** as applied to the Affidavit of Tamera Russell (Doc. 19).  The Court may not consider paragraphs 5 through 14 of that affidavit.

Additionally, Defendant's Motion for Summary Judgment (Doc. 14) is **DENIED**. Plaintiff's claim of race discrimination in violation of Title VII of the Civil Rights Act of 1965 and her claim of race discrimination in violation of Section 2 of the Ohio Fair Employment Practices Act have both survive to be decided at trial.

**IT IS SO ORDERED**.

_s/Michael R. Barrett_
United States District Judge